HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DAVID DENNIS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>AMERIGROUP WASHINGTON, INC., a Washington corporation,<br><br>Defendant. | CASE NO. 3:19-cv-05165-RBL<br><br>ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>DKT. # 56 |

**INTRODUCTION**

THIS MATTER is before the Court on Defendant Amerigroup Washington, Inc.'s Motion for Summary Judgment. Dkt. # 56. After obtaining a new cell phone with a reassigned number, Plaintiff David Dennis began receiving automated calls from Amerigroup. These calls related to Medicaid benefits administered under Amerigroup's plan and were intended for the prior owner of Dennis's number. Dennis filed this class action lawsuit in March of 2019 alleging claims under the Telephone Consumer Protection Act (TCPA). Now, Amerigroup moves for Summary Judgment, arguing that its communications were not telemarketing and that they qualify for the TCPA's emergency exemption. For the following reasons, the Court GRANTS Amerigroup's Motion in part and DENIES it in part.

# BACKGROUND

**1.  Amerigroup's Administration of Managed Care Plans for the State of Washington**

Apple Health is Washington State's official Medicaid program and is operated by the Washington State Health Care Authority. Tisch Decl., Dkt. # 56, at 2. Rather than administer Medicaid benefits directly, Washington uses a system of managed care under which individuals who qualify for Apple Health receive their Medicaid benefits via a private plan that is paid for by the State. *See Managed Care*, WASHINGTON STATE HEALTH CARE AUTHORITY, https://www.hca.wa.gov/billers-providers-partners/programs-and-services/managed-care (last visited Feb. 4, 2020). Amerigroup, a subsidiary of Anthem, Inc., is one of several insurance companies that has contracted with the State to administer Apple Health plans. Dkt. # 56, at 2, 4.

Amerigroup receives numbers for new Apple Health enrollees from the State, which obtains those number directly from members. *Id*. at 4. The State submits updated information to Amerigroup every month. *Id*. Amerigroup does not obtain phone numbers for its members from any other source unless members submit their own numbers to the company. *Id*. On February 16, 2018, Amerigroup received information for a new Apple Health member with the same number that was later reassigned to Dennis. *Id*.

**2.  Amerigroup's Calls to Dennis**

In November of 2018, Dennis received a new cell phone with a new number. Dennis Decl., Dkt. # 58 at 2. Dennis received a total of seven communications from Amerigroup at his new number between December, 2018 and June, 2019. *See* Amerigroup Responses to Dennis's First Set of Interrogatories, Dkt. # 58, Ex. 1, at 5. In Dennis's recollection, these communications encouraged him to enroll in a health insurance plan with Amerigroup. *Id*. at 2. When Dennis

would try to call the number back to stop the communications, he was met with an automated message and no way to put an end to the calls. Dennis Dep., Dkt. # 62-1, Ex. C, at 39.

The first communication was an automated "Benefit Retention Call" that occurred on December 13, 2018. Scott Decl., Dkt. # 56, at 5. According to Amerigroup's standard script for such calls, their goal is to prevent lapses in Medicaid benefits for enrollees that will soon have to renew their coverage. Benefit Retention Call Script, Dkt. # 56, Ex. 4, at 2. The call proceeds as follows:

> Thank you for choosing Amerigroup Washington as your health plan! Our records show that your Washington Apple Health benefits may need to be renewed in the month of <RENEWAL_MONTH>. We want to make sure you have everything you need to keep your coverage if you still qualify. Washington Apple Health may have recently sent you a renewal letter. The letter gave you steps you need to take to keep your benefits. Please tell me yes or no, did you receive this letter?
>
> If yes: Did the letter ask you to complete your renewal before a certain date? All right. It's important that you will complete your renewal by the due date listed in the letter. If you don't, you will lose your health care coverage.
>
> If no: Okay. You may still be getting a letter, so please keep an eye out for it. If Washington Apple Health does not have your current address, they can't send you information about your benefits. If you've moved, we can help you update your address in a moment. You can also find out the status of your case and get other information online at Washington Apple Health website.

*Id.* at 4-5.

Amerigroup also placed three automated "Health Screening Calls" calls on January 8, January 11, and January 14, 2019. Dkt. # 56, at 5. These calls aim to "help Amerigroup better understand their members' health care needs by having them answer a series of questions regarding their health and care they have received." Health Screening Calls Script, Dkt. # 56, Ex. 2, at 2. The screening questions include whether the enrollee has been to the hospital or emergency room in the past six months, whether they are taking prescription medications, and

whether they need extra help with daily activities. *Id*. at 4-5. If the caller does not pick up, the script requires leaving the following voice message:

> Hello, this is Amerigroup calling for [Member's name]. There is some important information we'd like to get from you, so please call us back toll-free at [Amerigroup's number]. If you call us back within the next 48 hours and complete your short health screening, we will send you a First Aid Kit at no cost. Thank you for your time and have a good day.

*Id*. at 10. Dennis testifies that he interpreted this as a screening call to determine eligibility for insurance with Amerigroup, with the offer of a free first aid kit serving as a further incentive to sign up. Dkt. # 62-1, Ex. C, at 43; Dkt. # 58, at 2. However, recordings of the calls placed to Dennis show that they followed Amerigroup's script, with two ending quickly after Dennis stated that the intended recipient was unavailable and the third resulting in the exact voice message shown above. *See* Call Recordings, Dkt. # 62-1, Ex. B.

The last call from Amerigroup was an automated "Prescription Benefit Alert" on June 3, 2019. This call was to provide information about a new member ID card necessary to pick up prescription drugs at the pharmacy. Prescription Benefit Alert Script, Dkt. # 62-1, Ex. 2, at 2. Finally, Amerigroup also sent out two text messages on December 20, 2018 and February 12, 2019. Second Scott Decl., Dkt. # 62-1, at 2. These texts reminded enrollees about flu season and encouraged them to get flu shots. Dkt. # 62-1, Ex. 1.

**3.      Dennis's Lawsuit**

Dennis sued on March 5, 2019 and filed his First Amended Complaint on May 3, 2019. Dkt. ## 1, 32. The FAC proposes three classes of plaintiffs, all of whom "received a call from Amerigroup advertising its goods or services. Dkt. # 32 at 13. The first class received a call playing an "artificial or prerecorded voice . . . and did not provide Amerigroup with prior express written consent." *Id*. The second class received a call utilizing "an automated telephone dialing

system . . . and did not provide Amerigroup with prior express written consent." *Id*. The final class received a call "using an artificial or prerecorded voice telephone message that did not provide access to an automated opt-out mechanism." *Id*.

Dennis's four claims, however, do not precisely mirror these class definitions. *Id*. at 16-19. The first and second claims allege that Amerigroup violated the TCPA by "initiating telephone calls to Plaintiff and Class members using an artificial or prerecorded voice and/or an automated telephone dialing system to deliver a message without the prior express consent of the called party" *Id*. at 16-17. The only difference between them is that the first claim is only for "knowing and/or willful violations." *Id.* The third and fourth claims allege that Amerigroup placed calls using an "artificial or prerecorded voice that failed to include an automated opt-out mechanism as required by 64 C.F.R. § 64.1200(b)(3)." *Id*. at 17-18. Again, the only difference is that the third claim is for "knowing and/or willful violations." *Id*.

## DISCUSSION

**1.     Summary Judgment Standard**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law." *Id*. at 251-52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323-24.

There is no requirement that the moving party negate elements of the non-movant's case. *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). Once the moving party has met its burden, the non-movant must then produce concrete evidence, without merely relying on allegations in the pleadings, that there remain genuine factual issues. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## 2. Telephone Consumer Protection Act

Under the TCPA, it is unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA empowers the Federal Communications Commission to implement the Act through regulation, and courts have held that the FCC's regulations should be given "controlling weight." *See Sullivan v. All Web Leads, Inc.*, No. 17 C 1307, 2017 WL 2378079, at *3 (N.D. Ill. June 1, 2017) (citing *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 449-50 (7th Cir. 2010)).

For automated calls involving advertisements or telemarketing, the FCC requires callers to "provide an automated, interactive voice- and/or key press-activated opt-out mechanism for

the called person to make a do-not-call request." 47 C.F.R. § 64.1200(b)(3). Furthermore, for telemarketing calls to cellular numbers under § 227(b)(1)(A)(iii), the FCC has specified that prior express consent must be *written*. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1839 (2012) ("*2012 Order*"). This includes "so-called 'dual purpose' calls, those with both a customer service or informational component as well as a marketing component." *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 917 (9th Cir. 2012). (citing *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14097-98 (2003)). Although "purely informational messages" do not require written consent, prior express consent is still required.[1] *2012 Order*, 27 F.C.C. Rcd. at 1841-42; *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, 8022-23 (2015) ("*2015 Order*"). Only emergency calls are exempt from all prior consent requirements. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 31 F.C.C. Rcd. 9054, 9062 (2016) ("*2016 Order*").

Amerigroup argues that Dennis's claims fail because all of Amerigroup's communications were informational in nature and served an emergency purpose. According to Amerigroup, none of its calls attempted to sell a product to Dennis or even discussed products or services that cost money. Amerigroup further contends that, because Medicaid recipients are a particularly vulnerable group, its calls to obtain health information and prevent coverage lapses were emergency in nature.

In opposition, Dennis insists that Amerigroup's calls qualify as telemarketing because they encourage renewed enrollment in Amerigroup's insurance plans to profit Amerigroup. In

---

[1] For calls made to a residential number, in contrast, no prior consent at all is required for informational messages. *See 2012 Report and Order* at 1841; *see also* 47 U.S.C. § 227(b)(1)(B).

any case, Dennis asserts that there is a genuine dispute of material fact regarding the purpose of Amerigroup's calls and claims that Amerigroup has not produced documentation for all the calls it placed to Dennis. Finally, Dennis argues that the calls do not qualify for the emergency exemption because they did not concern emergency health issues and were not even directed to an Amerigroup customer.

*1.     Telemarketing*

Dennis's third and fourth claims alleging that Amerigroup failed to include an automated opt-out mechanism with its calls can only succeed if the calls were telemarketing or included advertisements. 47 C.F.R. § 64.1200(b)(3); FAC, Dkt. # 32 at 17-18.  In addition, Dennis's proposed class definitions allege that Amerigroup failed to obtain prior express *written* consent, which is only required for telemarketing calls to cellular numbers. *2012 Order*, 27 F.C.C. Rcd. at 1841-42; Dkt. # 32 at 17-18. Under the FCC's regulations, "[t]he term telemarketing means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12). "The term advertisement means any material advertising the commercial availability or quality of any property, goods, or service." § 64.1200(f)(1).

In *Smith v. Blue Shield of California Life & Health Insurance Co.*, the court held that calls notifying the recipient about changes to their healthcare plan, the existence of alternate plans, and the time-sensitive opportunity to renew or modify their coverage were informational. 228 F. Supp. 3d 1056, 1066 (C.D. Cal. 2017). *Savett v. Anthem, Inc.* reached a similar conclusion regarding calls "meant to provide information to members about their insurance plan's benefits" and also held that flu shot reminder calls were not telemarketing. No. 1:18-CV-274, 2019 WL 5696973, at *5-7 (N.D. Ohio Nov. 4, 2019). Perhaps most relevant to this case, *Williams v.*

*National Healthcare Review* held that calls informing recent hospital patients about their eligibility for Medicaid were not telemarketing because "Medicaid is not a 'commercially available' program." No. 2:15-CV-0054-RFB-PAL, 2017 WL 4819097, at *7 (D. Nev. Oct. 25, 2017). The court reached this conclusion despite the fact that the private company placing the calls was paid by the hospital based on how many patients obtained coverage under Medicaid for procedures. *Id*.

The reasoning from these cases applies with equal force here—none of Amerigroup's calls qualify as telemarketing. The scripts produced by Amerigroup reveal that the "Prescription Benefits Alert" and "Healthcare Screening Calls" are unrelated to commercial transactions and merely seek to gather or impart important information. *See* Dkt. # 56, Ex. 2; Dkt. # 62-1, Ex. 2. Although Dennis muses in his declaration that the offer of a free first aid kit must have meant that the "Healthcare Screening Calls" were trying to induce an insurance sale, this is nothing more than Dennis's own subjective impressions. Dkt. # 58 at 2. In reality, the script and recordings reveal that the offer of a free first aid kit was intended to induce people to participate in an important health survey, not purchase insurance.

The only call that is even close to telemarketing is the "Benefit Retention Call," but this too falls short. The underlying trigger for the "Benefit Retention Call" is the government-mandated need to re-determine qualification for Medicaid every twelve months. 42 C.F.R. § 435.916(a). In other words, the aim of the call is not to retain the recipient as a *customer*, but rather to ensure that they remain a *beneficiary* of Medicaid. And as the court pointed out in *Williams*, "[p]rivate entities . . . do not and cannot sell Medicaid because Medicaid is a government program that is not sold." 2017 WL 4819097, at *4. This is categorically different than if Amerigroup was calling because a customer's plan was expiring and Amerigroup wanted

them to purchase more coverage. While Amerigroup may indirectly profit if more people are eligible for Medicaid under their plans, this does not matter because Amerigroup cannot "encourage[e] the purchase" of government benefits. *See* 47 C.F.R. § 64.1200(f)(12).

Dennis's attempt to muddy the water by claiming a genuine dispute of fact is unavailing. As the Court noted previously, Dennis's own recollections of how he felt while listening to the calls is irrelevant. Amerigroup has produced scripts for the calls and Dennis does not contest their authenticity. Nor is the Court persuaded by Dennis's claim that Amerigroup has not addressed the content of three of the seven disclosed calls. *See* Dkt. # 58, Ex. 1, at 5. Although Amerigroup's original Motion only addresses four of the calls, its Reply brief explains that two of the seven calls were text messages that fell completely outside the scope of Dennis's claims. The final "Prescription Benefit Alert" call is also addressed in the Reply and does nothing to redeem Dennis's arguments. And although Dennis claims that the Court denied his prior motion to compel further information about the purpose of Amerigroup's calls, this is inaccurate. The Order Dennis refers to [Dkt. # 48] denied his attempt to compel production of Amerigroup's call list and call data for class certification purposes as moot [Dkt. # 41] after the Court bifurcated the case. It had nothing to do with the purposes behind the particular calls to Dennis, which are sufficiently revealed by the scripts and recordings.

Amerigroup's communications with Dennis were informational and did not constitute telemarketing. Dennis's third and fourth claims therefore fail.[2] Dkt. # 32 at 17-18.

---

[2] Although Dennis's proposed class definitions are not at issue, the Court notes that this ruling causes major problems for the current definitions, which only encompass members who did not provide prior express *written* consent to Amerigroup. FAC, Dkt. # 32, at 13. For calls to cellular phones, written consent is only required if the calls constitute telemarketing.

**2.    *Emergency exemption***

The informational nature of Amerigroup's calls does not defeat Dennis's first two claims, which allege that Amerigroup violated the TCPA by failing to obtain prior express consent of any kind. *Id*. at 16-17. These claims hinge on the emergency exemption.[3] According to the FCC, "[t]he legislative history of the TCPA indicates a congressional intent to interpret the term 'emergency' broadly rather than narrowly." *In the Matter of the Tel. Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 2736 (1992). The agency has thus interpreted the term "emergency purposes" to encompass "calls made necessary in any situation affecting the health and safety of consumers." 47 C.F.R. § 64.1200(f)(4).

Several courts have held that calls related to healthcare can qualify under the TCPA's emergency exemption. In *Roberts v. Medco Health Solutions, Inc.*, for example, the court concluded that calls "involving an attempt to confirm or refill a prescription order, schedule a prescription delivery, or confirm that a prescription is on its way" fell within the exemption. No. 4:15 CV 1368 CDP, 2016 WL 3997071, at *3 (E.D. Mo. July 26, 2016); *see also Lindenbaum v. CVS Health Corp.*, No. 1:17-CV-1863, 2018 WL 501307, at *2 (N.D. Ohio Jan. 22, 2018) (holding that CVS's pharmacy reminder calls fell within the TCPA's emergency exemption). As the court explained, "in many instances a patient's ability to timely receive a prescribed medicine

---

[3] The Court notes that the FCC has developed additional healthcare-specific exemptions to the TCPA. One is for "call[s] that deliver[] a "health care" message made by, or on behalf of, a 'covered entity' or its 'business associate,' as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103." 47 C.F.R. § 64.1200(a)(2). The second was introduced in the FCC's *2015 Order* and applies to most non-telemarketing healthcare calls, although the caller must satisfy a number of conditions. *See 2015 Order*, 30 F.C.C. Rcd. at 8031-32. However, as the court explained in *Coleman v. Rite Aid of Georgia, Inc.*, it is unclear whether these exemptions do away with all consent requirements or only written consent. 284 F. Supp. 3d 1343, 1347-50 (N.D. Ga. 2018). Because the parties have not briefed these complicated exemptions and they may have no impact, the Court will not determine whether they apply.

is critical in preventing a major health emergency." 2016 WL 3997071, at *3. Notably, in both *Roberts* and *Lindenbaum*, the calls were made to wrong numbers. *Id.* at *1-2; 2018 WL 501307, at *2.

On the other hand, several courts have held that prescription notifications and similar healthcare-related calls cannot fall within the emergency exemption if the recipient had informed the caller that they did not wish to receive the calls. *See Coleman v. Rite Aid of Georgia, Inc.*, 284 F. Supp. 3d 1343, 1346 (N.D. Ga. 2018); *Clair v. CVS Pharmacy, Inc.*, 222 F. Supp. 3d 779, 780 (N.D. Cal. 2016). It is unclear whether this reasoning applies where the recipient was unable to speak with a live human being and therefore could not ask for the calls to stop, despite wanting them to. In a footnote to its *2016 Order*, the FCC stated that "purported emergency calls cannot be targeted to just any person. These calls must be about a bona fide emergency that is relevant to the called party." *2016 Order*, 31 F.C.C. Rcd. at 9063 n.76. But in the same Order, the FCC stated, "Even though calls made for an emergency purpose can be made without the prior express consent of the called party, we encourage educational organizations to regularly update their emergency calling lists to ensure that emergency-purpose calls do in fact reach the parent or guardian of each affected student and are not received by consumers with no connection to the school." *Id.* at 9062. This suggests that even wrong-number calls can qualify for the exemption.

Fortunately, the Court need not resolve this dilemma because most of the calls placed to Dennis were not for emergency purposes. The concept of "necessity" simply does not reach far enough to encompass the "Prescription Benefits Alert" and "Healthcare Screening Calls." The "Prescription Benefits Alert" served as a backup reminder that Amerigroup had sent the recipient a new benefits card that they would need to take to the pharmacy to avoid delays in obtaining

medication. Dkt. # 62-1 at 2; Dkt. # 62-1, Ex. 2. But there is no evidence that the intended recipient of the call to Dennis actually had a serious need for medication or had not received the card in the mail as planned. *See Clair*, 222 F. Supp. 3d at 781 (observing that whether prescription reminder calls qualify as emergencies is a fact-specific inquiry). Outside of such circumstances, the "Prescription Benefits Alert" does not qualify as an emergency.

The "Healthcare Screening Calls" were also not placed for emergency purposes. These calls were intended to "help Amerigroup WA better understand their members' health care needs." Dkt. # 56, Ex. 2, at 2. While this is a laudable goal, there is no indication of a pressing need that would make such a call "necessary" to a recipient's health at any given time. *See* 47 C.F.R. § 64.1200(f)(4).[4] While Amerigroup emphasizes the vulnerability of all Medicaid beneficiaries, there is no reason to believe that they all have emergent health needs requiring prompt attention. Amerigroup also does not explain why the generalized questions in the "Healthcare Screening Calls" were imperative for the health of the particular plan member who had Dennis's number before him. Dennis's first two claims thus survive summary judgment.

However, the Court does find that the "Benefit Retention Call" was made for emergency purposes. The myriad ramifications of a sudden loss of insurance coverage, such as the inability to obtain preventative care and the risk of an uncovered health crisis, affect a consumer's "health and safety." *See* 47 C.F.R. § 64.1200(f)(4). And unlike the other calls at issue, the threat of a coverage lapse on an upcoming date makes the "Benefit Retention Call" necessary to the particular recipient being contacted.

---

[4] Amerigroup points out that these calls are contractually and regulatorily required for plans providing coverage under Medicaid. *See* Tisch Decl., Dkt. # 56, at 3 (citing 42 C.F.R. §§ 438.208 and 438.330). While this may be so, it does not automatically mean that the calls qualify under the TCPA's emergency exemption.

1     Furthermore, because this was the first call that Amerigroup placed to Dennis after he

2 received his new phone, Amerigroup is not at fault for calling a wrong number. The FCC has

3 explained that "callers who make calls without knowledge of reassignment and with a reasonable

4 basis to believe that they have valid consent to make the call should be able to initiate one call

5 after reassignment as an additional opportunity to gain actual or constructive knowledge of the

6 reassignment and cease future calls to the new subscriber." *2015 Order*, 30 F.C.C. Rcd. at 8000.

7 Although the State normally updates Amerigroup on member phone numbers monthly, it did not

8 inform Amerigroup that the number previously belonging to its member had been reassigned to

9 Dennis. Tisch Decl., Dkt. # 56, at 4. Although Amerigroup may have had constructive

10 knowledge of the reassignment after the initial December 13, 2018 call, it did not have such

11 knowledge beforehand. The "Benefit Retention Call" therefore qualifies under the emergency

12 exemption and did not require prior express consent.

**CONCLUSION**

    For the above reasons, the Court DENIES Amerigroup's Motion for Summary Judgment with respect to Dennis's first and second claims alleging that Amerigroup called Dennis without prior express consent in violation of 47 U.S.C. § 227(b)(1)(A)(iii). The Court GRANTS the Motion with respect to Dennis's third and fourth claims alleging that Amerigroup placed calls without including an automated opt-out mechanism in violation of 64 C.F.R. § 64.1200(b)(3).

    IT IS SO ORDERED.

    Dated this 10th day of February, 2020.

Ronald B. Leighton
United States District Judge